**IN THE UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF ARKANSAS**
**HELENA DIVISION**

**IN RE:  TURNER GRAIN MERCHANDISING, INC.,**        **Case No. 2:14-bk-15687**
                                                                            **(Chapter 7)**

                    **Debtor.**


**M. RANDY RICE, CHAPTER 7 TRUSTEE**                                **PLAINTIFF**

**VS.**                          **AP No. 2:16-ap-1113**

**M-REAL ESTATE LLC**                                               **DEFENDANT**


## <u>MEMORANDUM OPINION</u>

        M. Randy Rice, the successor Chapter 7 Trustee (the **"Trustee"**) in the bankruptcy case

filed by Turner Grain Merchandising, Inc. (the **"Debtor"**), filed this adversary proceeding

seeking to avoid a transfer made by the Debtor to M-Real Estate LLC (**"M-Real Estate"**) as a

preferential transfer under 11 U.S.C. § 547(b).  The Complaint asserts, alternatively, a cause of

action for a constructively fraudulent transfer under 11 U.S.C. § 548(a)(1)(B).[1]  M-Real Estate

denied that the transfer was avoidable as a preferential transfer and asserted the affirmative

defenses of ordinary course of business between the Debtor and M-Real Estate (11 U.S.C.

§ 547(c)(2)(A)), ordinary business terms (11 U.S.C. § 547(c)(2)(B)), and contemporaneous

exchange for new value (11 U.S.C. § 547(c)(1)).

        The parties agreed to the trial being set out of division, and a trial on the merits was held

September 20, 2017, in Little Rock, Arkansas.  Hamilton Moses Mitchell of Rice & Associates

P.A. appeared on behalf of the Trustee.  The Trustee also appeared.  Lloyd Ward of Ward Legal

---

[1]From the opening statements and closing arguments it is apparent that the Trustee no longer intends to pursue his
alternative cause of action under 11 U.S.C. § 548(a)(1)(B); therefore, the Complaint as to this cause of action shall
be dismissed.

Group PLLC appeared on behalf of M-Real Estate, along with Allen L. Monroe, the owner of M-Real Estate.

During opening statements, M-Real Estate's attorney stated that the issues for trial had been narrowed to M-Real Estate's affirmative defenses and only one element of the requirements for a finding of a preferential transfer under 11 U.S.C. § 547(b), the "hypothetical Chapter 7 liquidation analysis."[2]

For the reasons stated below, the Court will enter judgment in favor of the Trustee.

## JURISDICTION

The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1334 and 157. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(F) and (H). The parties expressly consented to the bankruptcy court entering a final order on all claims and causes of action asserted in this adversary proceeding in the agreed *Pre-Trial Order and Scheduling Order* entered on the Court's docket on March 1, 2017, as entry number eleven. The following constitutes the Court's findings of fact and conclusions of law in accordance with Federal Rule of Bankruptcy Procedure 7052.

## FACTS

The Debtor filed a Chapter 11 bankruptcy petition on October 23, 2014, and the case was converted to a Chapter 7 case on May 15, 2015. Richard L. Cox was appointed as the Chapter 7 Trustee and served in that capacity until May 12, 2016, when M. Randy Rice was appointed the successor trustee.

---

[2]The phrase "hypothetical Chapter 7 liquidation analysis" refers to the requirement under Section 547(b)(5) that the transfer sought to be avoided enabled the creditor "to receive more than such creditor would receive if – (A) the case were a case under chapter 7 of this title; (B) the transfer had not been made; and (C) such creditor received payment of such debt to the extent provided by the provisions of this title."  11 U.S.C. § 547(b)(5) (2012).

This dispute involves a transaction between the Debtor and M-Real Estate in which the Debtor purchased wheat from M-Real Estate. The two parties had dealt with one another since 2009. The typical transaction between the Debtor and M-Real Estate would commence when the parties entered into a contract for the Debtor to purchase a certain amount of wheat or other grain from M-Real Estate at a set price. The grain would be transported in a series of truck loads to locations designated by the Debtor until the total amount of grain contracted for had been delivered. The contract or contracts related to the transfer in question were not introduced into evidence.

On July 16, 2014, after receiving wheat the Debtor agreed to purchase from M-Real Estate, the Debtor issued check number 14717 to M-Real Estate LLC in the amount of $18,545.84 drawn on the Debtor's account at Merchants & Planters Bank (**"Check 14717"**) in payment. (Trustee's Ex. 4). The Trustee testified that although he found the original check stub for Check 14717 he was unable to locate the check in the Debtor's records. He further testified that Check 14717 neither cleared the bank nor was returned for insufficient funds. At the time Check 14717 was written, the Debtor's account at Merchants & Planters Bank did not have sufficient funds to honor the check.

Two days later the Debtor issued check number 4474 made payable to M-Real Estate dated July 18, 2014, in the amount of $18,545.84 ("**Check 4474"**). (Trustee's Ex. 1). The memo section of the check bears the notation "Wheat 2014." (Trustee's Ex. 1). Check 4474 was drawn on an account owned by the Debtor at Helena National Bank (the **"HNB Account"**). (Trustee's Ex. 1). The HNB Account was listed as an asset in the Debtor's schedules. (Trustee's Ex. 3, Sch. B at 9).

The check was endorsed for deposit by "M-Real Estate LLC - Larry Wilson" and was honored by Helena National Bank on July 29, 2014.  (Trustee's Ex. 1).  The Trustee testified Check 4474 was for payment of a debt the Debtor owed to M-Real Estate for wheat, and this debt was not secured by a lien or security interest in the Debtor's property.  Mr. Monroe's testimony was consistent with the Trustee's statement that there was no lien in the proceeds represented by Check 4474.

The Trustee introduced the Debtor's "Check Detail" for Check 4474, which included the check stub for Check 4474.  (Trustee's Ex. 4).  The check stub references two contracts, "TG # 1058" with the amount of $11,926.01 and "IR # 583" with the amount of $6,619.83, totaling the $18,545.84 check amount.  (Trustee's Ex. 4).

During its case-in-chief, M-Real Estate introduced the purchase settlements documenting each transaction.  (Def's. Exs. 2 & 3).  The TG # 1058 contract resulted in the payment of $11,926.01 for 1902.94 bushels of wheat, the amount of wheat delivered in the nine loads reflected on delivery sheet # 100-001216.  (Def's. Ex. 2).  The explanation of the payment to M-Real Estate in the amount of $11,926.01 refers to this same delivery sheet tying the information on the nine loads to the payment.  (Def's. Ex. 2).  The delivery sheet reflects the delivery dates for the nine loads ranging from June 16, 2014, to June 30, 2014.

The IR # 583 contract resulting in the payment of $6,619.83 references 1298.60 bushels of wheat, the amount of wheat delivered in the seven loads listed on delivery sheet # 200-00060401.  (Def's. Ex. 3).  The explanation of the payment to M-Real Estate in the amount of $6,619.83 refers to this same delivery sheet tying the information on the seven loads to the payment.  (Def's. Ex. 3).  The delivery sheet reflects the delivery dates for the seven loads ranging from June 14, 2014, to June 16, 2014.  As to the IR # 583 contract, this exhibit is

4

consistent with the Trustee's testimony that the Debtor's records indicate the final load of wheat was delivered to the Debtor on June 16, 2014.

The claims register for the Debtor's bankruptcy case was introduced by the Trustee (the **"Claim Register"**). (Trustee's Ex. 5). The Claims Register reflects the following totals:

| | |
|---|---|
| Total Claims Amount | $39,833,336.77 |
| Total Secured Claims | $1,817,416.88 |
| Total Priority Claims | $2,314,852.11 |

(Trustee's Ex. 5).

By subtracting the amount of secured claims from the amount of total claims, the Trustee estimated that there was $37 million in unsecured and priority claims. The Trustee testified that he did not anticipate being able to pay unsecured creditors 100% of their claims. He asserted that, in fact, his review of the Debtor's petition and schedules and the claims filed by each creditor demonstrated that "the debts greatly exceed the assets of the case" by $11 million. (Tr. at 35-36). Upon further review and analysis, he stated that the value of the assets was substantially less than initially listed on the schedules while the amount of the claims was substantially more.

According to the Trustee, the only assets available at this point in time for liquidation and payment to unsecured creditors will result from pursuing receivables and preference actions. He stated that even if he is successful at avoiding some payments as preferences, the funds recovered for the estate would result in additional claims in an equal amount allowable to the preference defendants. While a recovery on an avoidance action would inure to the benefit of all unsecured creditors, it would not result in a payment in full to the unsecured creditors. The Trustee concluded that "I'm just struggling to make a distribution . . . at all," and a distribution

5

will only result if he is "semi-successful on pursuit of some of these causes of action."  (Tr. at 36-37).

Mr. Monroe, who has a college degree in agriculture, testified on behalf of M-Real Estate, of which he is sole owner.  M-Real Estate owns 2,000 acres of farm land in Lee County, Arkansas, where rice, soybeans, and corn are grown.  Mr. Monroe lives in Dallas, Texas, and Larry Wilson manages the farming operations for M-Real Estate in Lee County.  Mr. Monroe stated that he speaks with his manager each morning and travels from Dallas to Lee County about every two weeks.  M-Real Estate's farm land is farmed by Keith Freeland.

As the Court described above, M-Real Estate began doing business with the Debtor in 2009 by contracting for the sale of its grain to the Debtor.  Mr. Monroe stated that after the last load on the contract was "completed," M-Real Estate would pick up its check that day.

He further explained that when M-Real Estate would deliver grain to the designated location, the load would be weighed and the driver would be given a delivery ticket with the weight of the load.  This ticket would then be taken to the Debtor's office for payment,  and "you can pick the check up the next day," or request that the check be mailed, which would necessitate a delay.  (Tr. at 62, 80).  Mr. Monroe testified this was the standard procedure but later clarified that the issuance of the check occurs "[i]f the contract has been completed," that is, all grain contracted for has been delivered.  (Tr. at 80).  When asked as to Check 4474 if the contract was completed he responded, "If we were paid, yes."  (Tr. at 80).

Mr. Monroe testified that he was familiar with M-Real Estate's contracts for the sale of grain and stated that he discusses price and approves the decision to "book" the grain for a particular price.  As to the process between the Debtor and M-Real Estate, he stated that the Debtor would designate the delivery location and M-Real Estate would notify Keith Freeland,

the farmer harvesting the grain on M-Real Estate's farm land, who would have the grain delivered to the location requested.  There the grain would be weighed, and the driver of the truck delivering the grain would take the delivery ticket back to Mr. Freeland.  The delivery ticket would then be turned over to the Debtor for verification that the grain delivered matches its records, after which the Debtor would issue a check in payment for the grain.

Mr. Monroe has done business with Mr. Freeland for twelve years and is not aware of Mr. Freeland ever holding a delivery ticket for thirty days before turning it in for payment.  Mr. Monroe was asked "why will people, such as Mr. Freeman [sic], immediately take the ticket over and cash it; I mean, what's the logic behind that?"  (Tr. at 81).  His response was, "Most of the time you owe money to the bank, Mr. Freeland's checks would have been written to him and a bank.  Mine are not written to me and a bank.  The landowner is normally not that way."  (Tr. at 81).

In further explaining the transaction related to Check 4474, Mr. Monroe testified that he thought the grains on this contract were being delivered to Helena.  When asked how he knew this, he stated that he reviewed the check and deposit slip.  Then he added that he also had discussions with his "people after this problem came up."  (Tr. at  69).  He disputed the Trustee's testimony that the final load on the contract referenced by Check 4474 dated July 18, 2014, was delivered June 16, 2014,  stating he would not have waited thirty days from the date of delivery to take the ticket to the Debtor for payment.  (Tr. at 79).

When asked about when the grain would have been delivered that was paid by Check 4474 dated July 18, 2014, Mr. Monroe admitted he did not know but said the last part of the wheat would have been delivered within a week of the check.  He testified the reason he knew this was because M-Real Estate would "get paid immediately."  (Tr. at 61).

7

Mr. Monroe stated that once M-Real Estate is paid for its grain, there is no reason to keep the delivery tickets. He said it was not in the normal course of business for M-Real Estate to keep the delivery receipts or gas receipts. No delivery receipts were introduced into evidence.

Mr. Monroe testified that in his experience in being "around a farm for 73 years or 74 years" that you are "paid immediately" after delivery because "farmers are starving to death, they want their money." (Tr. at 71). He stated that he is familiar with other farmers doing business with the Debtor and had discussions with other farmers regarding their business with the Debtor after the bankruptcy. Mr. Monroe testified that the process is always the same for grains, that is, "as soon as you deliver you're paid." (Tr. at 77).

According to Mr. Monroe, there was no pressure or unusual activity that was asserted by M-Real Estate on the Debtor for Check 4474 to be issued.

M-Real Estate introduced seventeen deposit slips with copies of related checks issued to M-Real Estate by the Debtor from October 22, 2009, to April 9, 2014. (Def's. Ex. 1). No documentary evidence was introduced reflecting any information concerning date of delivery, weight, destination, or contract number for any of the payments reflected on the seventeen deposit slips. The seventeen deposits slips did not include the deposit slip for Check 4474.

Mr. Monroe was asked if the payments reflected on the checks with the seventeen deposit slips would have been "the same or similar transactions" as the transaction represented by Check 4474 and his response was, "I can't imagine why it would be different. I don't know. I can't imagine it being different." (Tr. at 75).

When asked whether he was familiar with the "farming practices in this general area," Mr. Monroe responded, "I would think so, yes." (Tr. at 73). He has been involved with farming on his farm, which was originally his uncle's farm, since he was ten years old. He was asked if

8

he was "familiar with what the industry standards are; in other words, how – how people conduct business in this industry?" (Tr. at 74). He first responded, "I thought I was." (Tr. at 74). When his attorney then asked, "Do you believe you are?" he responded, "Yes, sir." (Tr. at 74).

M-Real Estate's attorney asked, "And are you familiar with what the industry standards and practices are in regard to the delivery of grain to entities such as Turner Grain," to which Mr. Monroe replied, "It's always paid immediately, as soon as a contract – you're paid immediately." (Tr. at 73-74). Mr. Monroe stated that the industry standard is that only twenty-four hours elapses between delivery of the receipt to the grain buyer and the issuance of payment. When asked if that is what happened in regard to Check 4474 he responded, "I really don't know. You know, I have no idea, it's an assumption, and we don't assume around here." (Tr. at 90). When asked if the other checks introduced by M-Real Estate (which did not include Check 4474) were "all made by industry standards," Mr. Monroe responded in the affirmative. No additional evidence was introduced regarding the dates the delivery receipts may have been taken to the Debtor for payment.

The Trustee seeks to avoid the $18,545.84 transfer made by the Debtor to M-Real Estate under the provisions of Section 547(b) of the Bankruptcy Code, and recover the transfer from M-Real Estate pursuant to Section 550. M-Real Estate argues the Trustee has failed to meet his burden to prove the transfer was a preferential transfer and even if the Court finds that the Trustee has met his burden, the transfer is not avoidable due to certain exceptions found in Section 547(c), discussed in more detail below.

## DISCUSSION

The Court will first address the issue of whether the Trustee has met his burden of proving the elements of a preferential transfer under 11 U.S.C. § 547(b), and if so, the Court will consider the affirmative defenses asserted by M-Real Estate.

### A. Preferential Transfer

Section 547(b) promotes one of the primary policies of the Bankruptcy Code that there should be "an equal distribution of the debtor's assets among similarly situated creditors." *Velde v. Kirsch,* 543 F.3d 469, 472 (8th Cir. 2008) (citing *Danning v. Bozek (In re Bullion Reserve of N. Am.),* 836 F.2d 1214, 1217 (9th Cir. 1988)).

To avoid a transfer under Section 547(b), the Trustee must prove the occurrence of a transfer of an interest of the debtor in property that was to or for the benefit of a creditor; for or on account of an antecedent debt owed by the debtor before such transfer was made; made while the debtor was insolvent; and made on or within ninety days before the date of the filing of the petition. In addition, the Trustee must prove that the transfer enables such creditor to receive more than such creditor would receive if the case were a case under Chapter 7 of title 11, the transfer had not been made, and such creditor received payment of such debt to the extent provided by the provisions of title 11. 11 U.S.C. § 547(b)(1)-(5) (2012).

Section 547(g) places the burden of proving the elements of a preferential transfer on the Trustee. 11 U.S.C. § 547(g) (2012). The standard related to proving each element of a preference action is by a preponderance of the evidence. *Doeling v. O'Neill (In re O'Neill)*, 550 B.R. 482, 514 (Bankr. D.N.D. 2016) (citing *Stingley v. AlliedSignal, Inc. (In re Libby Int'l, Inc.)*, 247 B.R. 463, 466 (8th Cir. 2000)).

As noted above, M-Real Estate's counsel stated at trial that the issue of whether the transfer resulted in an avoidable preference under Section 547(b) has been narrowed to a determination of whether the Trustee has satisfied the test under the hypothetical Chapter 7 liquidation analysis.

Indeed, at trial the Trustee proved the remaining elements by a preponderance of the evidence.  First, there was a transfer of an interest of the Debtor in property.  The Trustee introduced Check 4474 and testimony showing the funds were drawn from a bank account owned by the Debtor, a bank account that was an asset of the Debtor's bankruptcy estate as reflected on the Debtor's schedules.  (Trustee's Ex. 3, Sch. B at 9).

The second element, that the transfer was to or for the benefit of a creditor, was also shown by the evidence in that the transfer was made to M-Real Estate in payment for wheat sold to the Debtor by M-Real Estate and was deposited into the account of M-Real Estate.  Mr. Monroe's testimony also established that the payment was for the benefit of M-Real Estate as part of its farming operations.

As to the third element, the Trustee proved that the transfer was on account of an antecedent debt.  The Trustee testified that Check 4474 was in payment of a debt owed by the Debtor to M-Real Estate for wheat it had purchased prior to the time of the transfer.  The testimony by both parties established that the payment was made after the wheat was delivered pursuant to contracts that were entered into prior to the wheat being delivered.

The fourth element, that the transfer was made while the Debtor was insolvent, is met by the presumption of insolvency within the ninety days prior to the bankruptcy petition filing provided by statute.  11 U.S.C. § 547(f) (2012).  By introducing the date of the bankruptcy filing, October 23, 2014, and the date the check was honored by the Debtor's bank, July 29, 2014, the

Trustee proved there was a presumption of insolvency at the time the transfer was made.  In opening statements it was represented that M-Real Estate did not intend to present evidence to rebut this presumption of insolvency and, in fact, there was none.

  The same evidence of the petition filing date and the date Check 4474 was honored by the Debtor's bank also met the Trustee's burden of proving that the transfer was made within ninety days of the bankruptcy petition filing, satisfying the fifth element. *See Barnhill v. Johnson,* 503 U.S. 393, 400 (1992) (holding that for purposes of a preferential transfer analysis, a transfer by check occurs when the drawee bank honors the check).

  The disputed element requires the Trustee to prove, by a preponderance of the evidence, that the transfer to M-Real Estate enabled it to receive more than it would have received if the case were a case under Chapter 7, the transfer had not been made, and M-Real Estate had received payment on the debt owed to it by the Debtor to the extent provided by the provisions of the Bankruptcy Code.  11 U.S.C. § 547(b)(5) (2012).

  The bankruptcy court in In re Frankum observed that "[t]his analysis is often simplified by examining whether the creditor was paid on an unsecured, a secured claim, or a partially unsecured claim." *Luker v. Heartland Cmty. Bank (In re Frankum),* 453 B.R. 352, 369 (Bankr. E.D. Ark. 2011) (citing *A.I. Cred. Corp. v. Drabkin (In re Auto–Train Corp.),* 49 B.R. 605, 610 (D.D.C. 1985), *aff'd,* 800 F.2d 1153 (D.C. Cir. 1986)).  As recognized by In re Frankum, the court in In re Auto-Train Corporation discussed in depth why the distinction between types of claims is important to the concept of preference avoidance:

> A creditor who receives payment on an unsecured claim has always been preferred because he does not release any collateral to the debtor. He has obtained an unfair advantage at the expense of other creditors because he has "receive[d] a greater proportion of [his] unsecured claims than other unsecured claimants" who received payment after liquidation[.]

*In re Auto–Train Corp.,* 49 B.R. at 610 (quoting *Barash v. Pub. Fin. Corp.,* 658 F.2d 504, 508 (7th Cir. 1981)).

The rule derived from the Frankum court's holding may be applied to the instant case to explain why any payment on M-Real Estate's unsecured claim during the relevant period would meet the requirement of the hypothetical Chapter 7 liquidation analysis:

> [W]here the creditor has an unsecured claim, "as long as the distribution in bankruptcy is less than one-hundred percent, any payment 'on account' to an unsecured creditor during the preference period will enable that creditor to receive more than he would have received in liquidation had the payment not been made."

*Frankum,* 453 B.R. at 369 (quoting *In re Allegheny Health,* 292 B.R. 68, 78 (Bankr. W.D. Pa. 2003)).

In the case before the Court, M-Real Estate entered contracts to sell wheat to the Debtor and, after the wheat was delivered, the Debtor paid M-Real Estate for the wheat with Check 4474. The settlement documents show that the Debtor paid its debt in full by tendering Check 4474. (Def's. Ex. 2 & 3). The transactions did not involve a security interest, and there was no lien in the proceeds represented by the check tendered by the Debtor to M-Real Estate. Based on the foregoing facts the payment to M-Real Estate can be found to be payment in full of an unsecured antecedent debt.

The schedules filed by the Debtor reflect assets of $13 million and liabilities of $24 million. The claims register reflects $37 million in unsecured and priority debts, which is $13 million more than originally scheduled by the Debtor. The claims register does not include any administrative expense claims.

The Trustee testified that although the assets listed on the schedules totaled $13 million, during the administration of the case he has determined that the value of the assets to be administered is substantially less. The Trustee testified that he did not anticipate being able to

pay unsecured creditors 100% of their claims.  In fact, the Trustee stated that he is struggling to make a distribution at all.  The Trustee's testimony was credible and based on his comprehensive knowledge and review of the assets and liabilities of the Debtor's estate.

Based on the foregoing analysis, the Court finds that M-Real Estate was paid in full on its unsecured claim and that unsecured creditors in the Debtor's bankruptcy proceeding will receive less than 100% of their claims, if any distribution at all.  Therefore, the transfer to M-Real Estate represented by Check 4474 enabled it to receive more than it would receive if the case were a case under Chapter 7, the transfer had not been made, and it received payment on the debt owed to it by the Debtor to the extent provided by the provisions of the Bankruptcy Code.  The Trustee has met his burden of proving all the elements of 11 U.S.C. § 547(b), and the transfer represented by Check 4474 is found to be a preferential transfer.

### B.  Affirmative Defenses

Even though the Trustee has proven that Check 4474 was a preferential transfer, he cannot recover the transfer if M-Real Estate can prove that one of the exceptions provided in Section 547(c) is applicable to the transfer.  M-Real Estate has asserted three of these affirmative defenses:  ordinary course of business between the Debtor and M-Real Estate (11 U.S.C. § 547(c)(2)(A)), ordinary business terms (11 U.S.C. § 547(c)(2)(B)), and contemporaneous exchange for new value (11 U.S.C. § 547(c)(1)).  Each will be discussed separately below.

*(1)  Ordinary Course of Business.*  Section 547(c)(2) provides two separate affirmative defenses.  Each defense begins with the requirement that the "transfer was in payment of a debt incurred by the debtor in the ordinary course of business or financial affairs of the debtor and the transferee."  11 U.S.C. § 547(c)(2) (2012).  Once this element is met, if the creditor can also prove that the transfer was either "(A) made in the ordinary course of business or financial affairs

of the debtor and the transferee or (B) made according to ordinary business terms," the creditor

can prevent the trustee from recovering the transfer.  11 U.S.C. § 547(c)(2)(A)-(B) (2012).  The

creditor has the burden of proving this affirmative defense by a preponderance of the evidence.

11 U.S.C. § 547(g) (2012); *Jones v. United Sav. & Loan Ass'n (In re U.S.A. Inns of Eureka*

*Springs),* 9 F.3d 680, 682 (8th Cir. 1993).

There is not a "precise legal test" for bankruptcy courts to apply to any of the three

elements.  *Sarachek v. Luana Sav. Bank (In re Agriprocessors, Inc.),* 859 F.3d 599, 607 (8th Cir.

2017).  Courts describe the necessary legal inquiry as one requiring "a peculiarly factual

analysis."  *Id.* (citing *In re Armstrong*, 291 F.3d 517, 527 (8th Cir. 2002)).

The purpose of the ordinary course of business exception is "to leave undisturbed normal

financial relations, because it does not detract from the general policy of the preference section to

discourage unusual action by either the debtor or his creditors during the debtor's slide into

bankruptcy."  *Cent. Hardware Co. v. Sherwin-Williams Co. (In re Spirit Holding Co.),* 153 F.3d

902, 904 (8th Cir. 1998) (quoting S. REP. No. 95-989, at 88 (1978), *reprinted in* 1978

*U.S.C.C.A.N.* 5787, 5874; H.R. REP. No. 95-595, at 373 (1977), *reprinted in* 1978 *U.S.C.C.A.N.*

5963, 6329).

The Court will begin with an analysis of the initial requirement of whether the transfer at

issue was in payment of a debt incurred by the Debtor in the ordinary course of business or

financial affairs of the Debtor and M-Real Estate.  From the record before the Court it is clear

that this requirement has been met.

The testimony was that the Debtor has been purchasing grain from M-Real Estate since at

least 2009.  M-Real Estate introduced twenty checks it had deposited from the Debtor ranging in

dates issued from October 20, 2009, to April 4, 2014.  Most all the checks include a notation on

the face of the check indicating it was in payment for rice, corn, or soybeans.  (Def's. Ex. 1).
The settlement documents for Check 4474 indicate the Debtor and M-Real Estate entered into
agreements for the Debtor to purchase wheat from M-Real Estate.  (Def's. Ex. 2 & 3).  The debt
incurred by these agreements is the debt the Debtor paid by tendering Check 4474 to M-Real
Estate.  Based on the above facts, the Court finds that M-Real Estate has met its burden of
proving the initial requirement.

 <u>(A) Ordinary Course of Business of the Debtor and M-Real Estate.</u>  To determine
whether the transfer at issue was made in the ordinary course of business or financial affairs of
the debtor and the transferee the "controlling factor is whether the transactions between the
debtor and the creditor, both before and during the ninety-day period, were consistent." *Official
Plan Comm. v. Expeditors Int'l of Wash., Inc. (In re Gateway Pac. Corp.),* 153 F.3d 915, 917
(8th Cir. 1998) (citing *Lovett v. St. Johnsbury Trucking,* 931 F.2d 494, 497 (8th Cir. 1991)).
Therefore, the issue to be decided is whether M-Real Estate has "demonstrate[d] 'some
consistency with other business transactions between the debtor and the creditor.'" *Cox v.
Momar Inc. (In re Affiliated Foods Sw., Inc.),* 750 F.3d 714, 719 (8th Cir. 2014) (quoting *Lovett,*
931 F.2d at 497).

 Most cases examine whether the "preferential transfer involved an unusual payment
method or resulted from atypical pressure to pay" but if "those factors are absent . . . 'the
analysis focuses on the time within which the debtor ordinarily paid the creditor's invoices, and
whether the timing of the payments during the 90-day [preference] period reflected "some
consistency" with that practice.'" *Id*. (quoting *Lovett,* 931 F.2d at 498).

 The appropriate look-back period varies based on the facts in the particular case.  "The
purpose of a look-back period is to evaluate whether challenged transfers 'conform to the norm

established by the debtor and the creditor in the period before, preferably well before, the preference period.'" *Id*. at 720 (quoting *In re Tolona Pizza Prods. Corp.,* 3 F.3d 1029, 1032 (7th Cir. 1993)).

To properly compare activity during the time of the preferential transfer with transactions outside the ninety day preference period, "'numerous decisions'" suggest the appropriate look-back period should be "'based on a time frame when the debtor was financially healthy.'" *Id*. at 720 (quoting *In re Quebecor World (USA), Inc.,* 491 B.R. 379, 387 (Bankr. S.D.N.Y. 2013)).

M-Real Estate relies heavily on the testimony of Mr. Monroe to show that the preferential transfer at issue was made in the ordinary course of business or financial affairs of the Debtor and M-Real Estate.  The Court, however, finds that there was a lack of candor in Mr. Monroe's testimony.  This finding is based on his demeanor on the witness stand, the inconsistencies in his testimony, and his failure to exhibit personal knowledge in support of his assertions.  For these reasons, the Court finds that, considering all the evidence in the record, Mr. Monroe's testimony was not credible.

In finding a lack of credibility, the Court determines that Mr. Monroe's testimony, by itself, is insufficient evidence with which to carry M-Real Estate's burden of proof regarding the issue of the ordinary course of business or financial affairs between the parties.  However, in making the following findings the Court will consider his testimony where it is supported by other evidence in the record.

First, according to Mr. Monroe no pressure or unusual collection activity was exerted by M-Real Estate on the Debtor related to the issuance of Check 4474, and no evidence to the contrary appears in the record.   Therefore, the Court must look to other factors for its analysis. *Affiliated Foods,* 750 F.3d at 719.

The standard business practice between the Debtor and M-Real Estate was established through testimony and documentary evidence. This evidence focused on the length of time between M-Real Estate's delivery ticket being presented to the Debtor and the issuance of the check in payment on the contract.

Mr. Monroe testified that after the grain was delivered by truck to its destination and weighed, the truck driver would receive a delivery ticket showing the weight of the grain. He would hand over the delivery ticket to Mr. Freeland, and if the contract was completed, the ticket would then be taken directly to the Debtor's office for payment. Mr. Monroe explained that farmers like Mr. Freeland typically turn in the delivery tickets immediately to the Debtor to receive payment expeditiously so pending bank loans can be timely paid. He further testified that once presented with the delivery ticket, the Debtor would normally issue a check for payment of the grain the same day or the next day.

The Court notes that Mr. Monroe stated that he conversed with Mr. Wilson each morning and traveled to Lee County every couple of weeks. However, he did not explain how he had personal knowledge that Mr. Freeland or some other party had received and then relinquished M-Real Estate's delivery tickets to the Debtor within a particular time frame. Mr. Monroe's testimony about his personal knowledge of transactions with the Debtor seemed to be confined to knowing when M-Real Estate received payment.

The Court now turns to the issue of whether the standard practice between the parties described above was the practice employed over the course of the specific transaction in question. In describing the standard practice, Mr. Monroe testified that within twenty-four hours after the Debtor receives M-Real Estate's delivery receipt reflecting the last load in the contract, the Debtor issues a check. When asked if that is what happened in regard to Check 4474 he

responded, "I really don't know.  You know, I have no idea, it's an assumption, and we don't assume around here."  (Tr. at 90).

The documentary evidence is more credible than Mr. Monroe's testimony and does not support a finding that the transaction related to Check 4474 was in accord with the standard practice described by Mr. Monroe.  The Trustee introduced the Debtor's "Check Detail" for Check 4474, which included the check stub for Check 4474.  (Trustee's Ex. 4).  The check stub references two contracts, "TG # 1058" with the amount of $11,926.01 and "IR # 583" with the amount of $6,619.83, totaling the $18,545.84 amount of the check.  (Trustee's Ex. 4).  Therefore, the first deviation from the standard procedures as described by Mr. Monroe is that, in fact, Check 4474 paid two separate contracts instead of one.

M-Real Estate introduced the purchase settlement documents for the two contracts. (Def's Ex. 2 & 3).  The delivery sheet for TG # 1058 reflects the delivery dates for the nine loads with the last load being delivered on June 30, 2014.  The delivery sheet for IR # 583 reflects the delivery dates for the seven loads with the last load being delivered June 16, 2014.  Check 4474 was not issued until July 18, 2014, replacing Check 14717 that was issued July 16, 2014.  The Trustee noted that approximately thirty days intervened between the time the last load was delivered until Check 4474 was issued.  This testimony is consistent with the documentary evidence for the contract designated as IR # 583.

Mr. Monroe testified that he has done business with Mr. Freeland for twelve years and is not aware of Mr. Freeland ever holding a delivery ticket for thirty days before turning it in for payment.  When asked about when the grain would have been delivered that was paid by Check 4474 dated July 18, 2014, he admitted he did not know but said the last part of the wheat would have been delivered within a week of the check.  He testified the reason he knew this was

because M-Real Estate would "get paid immediately." (Tr. at 61). As the Court has previously stated, Mr. Monroe testified that M-Real Estate does not keep copies of the delivery tickets after being paid for the contract. No delivery tickets were introduced into evidence.

As to the transactions between the Debtor and M-Real Estate outside the preference period, M-Real Estate introduced seventeen deposit slips showing that M-Real Estate had deposited checks it received from the Debtor, along with copies of the checks. The only information to be gleaned from the deposit slips and checks is the amount of time between the date reflected on the check and the date M-Real Estate deposited the check into its bank account. This evidence is not helpful in analyzing the *Debtor's conduct* in receiving delivery tickets and issuing checks to M-Real Estate. [3]

Mr. Monroe was asked if the payments reflected on the deposit slips would have been "the same or similar transactions" as the transaction represented by Check 4474, and his response was, "I can't imagine why it would be different. I don't know. I can't imagine it being different." (Tr. at 75).

The evidence described above related to the standard practice between the parties, the transactions related to Check 4474, and the parties' transactions outside the preference period provide insufficient evidence for the Court to determine whether the transfer between the parties represented by Check 4474 was consistent with the parties' standard practice. Based on the foregoing, the Court finds that M-Real Estate has failed to meet its burden of proof on the affirmative defense of ordinary course of business or financial affairs of the Debtor and M-Real Estate, and judgment will be entered in favor of the Trustee on this affirmative defense.

---

[3] It should be noted, however, that all the checks related to the seventeen deposit slips were drawn on the Merchant & Planters Bank account. The fact that the Debtor issued the first check on the Merchant & Planters Bank account in payment for the transaction at issue and then replaced that check with a check drawn on the HNB Account is yet another deviation in the standard practice between the parties.

(B)  *Made According to Ordinary Business Terms.*  M-Real Estate also argues that the Trustee cannot avoid the transfer made by Check 4474 because the transfer was made according to ordinary business terms.  To determine whether the transfer at issue was made according to ordinary business terms, the creditor must introduce evidence of a "prevailing practice among similarly situated members of the industry facing the same or similar problems."  *U.S.A. Inns of Eureka Springs*, 9 F.3d at 685.

"What constitutes 'ordinary business terms' will vary widely from industry to industry." *Id*.  This defense involves an objective test and "'requires proof that the payment is ordinary in relation to the standards prevailing in the relevant industry.'"  *Id.* at 684 (quoting *Logan v. Basic Distribution Corp. (In re Fred Hawes Org.),* 957 F.2d 239, 244 (6th Cir. 1992)); *see also Gulfcoast Workstation Corp. v. Peltz (In re Bridge Info. Sys. Inc.),* 460 F.3d 1041, 1045 (8th Cir. 2006).

The Eighth Circuit has provided guidance to bankruptcy courts analyzing this element, instructing that the "focus" should be on "whether the terms between the parties were particularly unusual in the relevant industry, and that evidence of a prevailing practice among similarly situated members of the industry facing the same or similar problems is sufficient to satisfy [the creditor's] burden."  *U.S.A. Inns of Eureka Springs,* 9 F.3d at 685.

"A transferee may use its own employees or officers to establish" the ordinary business terms defense.  *Gulfcoast Workstation Corp.,* 460 F.3d at 1045 (citing *U.S.A. Inns of Eureka Springs,* 9 F.3d at 685 (relying on testimony of CEO of transferee)).  The employee or officer cannot, however, offer only testimony of the "practice between the transferee and the debtor; it must be 'evidence of a prevailing practice among similarly situated members of the industry

21

facing the same or similar problems.'"  *Id.* (quoting *U.S.A. Inns of Eureka Springs,* 9 F.3d at

685).

In addition, proving the ordinary business terms exception requires specific factual

support:

> "A creditor's evidence on the 'ordinary business terms' may not be vague and must
> be based on personal first-hand knowledge gained from exposure to the
> competitors' collections practices during or near the preference period. General
> testimony by an employee of the defendant, unsupported by any specific data, is
> insufficient to prove 'ordinary business terms.'"

*Cent. Hardware Co., v.  Walker-Williams Lumber Co. (In re Spirit Holding Co.),* 214 B.R. 891,

901 (E.D. Mo. 1997) (quoting *Schwinn Plan Comm. v. AFS Cycle & Co. (In re Schwinn Bicycle*

*Co.),* 205 B.R. 557, 573 (Bankr. N.D. Ill. 1997)), *aff'd sub nom. Cent. Hardware Co., v. Sherwin-*

*Williams Co.*, 153 F.3d 902 (8th Cir. 1998).

In the case before the Court, there is insufficient evidence to support a finding in favor of

M-Real Estate on the ordinary business terms exception.

As an initial matter, M-Real Estate never presented evidence identifying the "industry" in

which the parties' transaction was to be compared under the ordinary business terms analysis.

Mr. Monroe described the transaction between the Debtor and M-Real Estate as one dealing with

the purchase and sale of grain where the Debtor would direct that the grain be delivered to a

certain destination.  It was not clear whether the "industry" was that of similarly situated sellers

of grain to grain merchandisers, sellers of grain to grain dealers, or some other industry.

Even if the industry could be assumed to be either sellers of grain to grain merchandisers,

or sellers of grain to grain dealers, Mr. Monroe did not present evidence from which the Court

could find that he had sufficient personal knowledge to know the "industry standards" for parties

similarly situated to the Debtor and M-Real Estate.  For example, he was asked if he was

"familiar with what the industry standards are . . . how people conduct business in this industry" and he responded he "thought [he] was." (Tr. at 74). Immediately thereafter his attorney asked if he believed he was familiar with the industry standards, to which he answered, "Yes." (Tr. at 74). This and similar testimony by Mr. Monroe does not provide a sufficient basis to conclude he has knowledge of industry standards. Indeed, the Court finds such self-serving or uncertain statements to be unsupported by the record.

For example, no evidence was introduced concerning Mr. Monroe's background, experience, positions held in farming organizations, or other sources of personal knowledge that would lend credence to his testimony regarding industry standards. The testimony was that he is the sole owner of M-Real Estate and has a degree in agriculture. He lives in Dallas, Texas; confers with Mr. Wilson, his farm manager, each morning; and travels from Dallas to Lee County about every two weeks. Mr. Monroe is familiar with other farmers doing business with the Debtor and has had discussions with those farmers regarding their business with the Debtor after the bankruptcy. None of this background supports a finding that Mr. Monroe would have knowledge of industry standards. His experience with selling grain derives solely from his relationship with M-Real Estate, and his information about transactions by other farmers is limited to conversations with them regarding their dealings with the Debtor, not other grain merchandisers or dealers. In contrast, industry standards should be focused on transactions by parties other than the Debtor and M-Real Estate. Mr. Monroe's testimony as to how other farmers in the area dealt with the Debtor misses the mark.

In addition, his testimony as to "industry standards" was not only self-serving but imprecise and inconsistent. More specifically, when he was asked "are you familiar with what the industry standards and practices are in regard to the delivery of grain to entities such as

23

Turner Grain," he responded, "It's always paid immediately, as soon as a contract – you're paid immediately." (Tr. at 73-74). When asked the industry standard regarding the lapse of time between presentation of the delivery ticket and the issuance of the check in payment, Mr. Monroe testified it would be twenty-four hours. Although Mr. Monroe testified to procedures related to the relationship between the Debtor and M-Real Estate and also offered scant testimony concerning the Debtor's relationships with other sellers, the testimony as to the similarly situated entities in the industry was lacking.

The procedures discussed repeatedly included M-Real Estate entering a contract with the Debtor for the sale of a number of bushels of grain, the drivers receiving delivery tickets and taking them to the party harvesting the grain, and the delivery tickets being presented to the Debtor for immediate payment. There was no testimony concerning whether similarly situated entities entered contracts that required multiple deliveries to be completed, whether the contract had to be completed before any payment would be made by the purchaser, or whether the trigger for payment was taking the delivery ticket to the purchaser. In sum, Mr. Monroe never offered testimony as to the customary business practices used by similarly situated entities.

Even if M-Real Estate were found to have introduced sufficient evidence of industry standards, Mr. Monroe's testimony would still not support a finding in favor of M-Real Estate on ordinary business terms. Mr. Monroe's testimony related to industry standards was that the seller is "paid immediately" or within twenty-four hours of the presentation of the delivery ticket to the purchaser. When asked whether that is what happened with Check 4474, he admitted he really did not know. No other evidence introduced would support a finding that the payment for grain represented by Check 4474 occurred immediately or twenty-four hours after the Debtor

received the delivery ticket.  In fact, as discussed in the previous section, there is credible evidence to the contrary.

For all the foregoing reasons, the Court finds that M-Real Estate produced insufficient evidence to carry its burden of showing that the procedures described as being used by the Debtor and M-Real Estate are used by similarly situated entities throughout the relevant industry. Therefore, the Court finds that M-Real Estate cannot avail itself of the protections afforded by Section 547(c)(2)(B), and judgment will be entered in favor of the Trustee on the ordinary course of business defense.

*(2) Contemporaneous Exchange for New Value.*  M-Real Estate also asserted the affirmative defense of contemporaneous exchange for new value.  This exception provides that the Trustee may not avoid a preferential transfer to the extent that such transfer was "(A) intended by the debtor and the creditor to or for whose benefit such transfer was made to be a contemporaneous exchange for new value given to the debtor and (B) in fact a substantially contemporaneous exchange."  11 U.S.C. § 547(c)(1)  (2012).

"The purpose of this section is to protect transactions that do not result in a diminution of the bankruptcy estate."  *Velde,* 543 F.3d at 472.  To prevail on the contemporaneous exchange for new value exception, M-Real Estate has the burden of proving that *both* the Debtor and M-Real Estate intended the exchange to be contemporaneous; that the exchange was, in fact, contemporaneous; and that the exchange was for new value.  *Harrah's Tunica Corp. v. Meeks (In re Armstrong),* 291 F.3d 517, 525 (8th Cir. 2002) (citing *In re Gateway,* 153 F.3d at 918).

Although asserted in its pleadings, M-Real Estate's counsel did not mention the affirmative defense of contemporaneous exchange for new value in his opening statement or his

25

closing argument.  For the reasons that follow, the Court finds that M-Real Estate has not met its burden of proving that the defense is available to it under the facts of this case.

As to the first element, "'[t]he critical inquiry in determining whether there has been a contemporaneous exchange for new value is whether the parties *intended* such an exchange.'"  *In re Agriprocessors, Inc.,* 859 F.3d at 606 (emphasis added) (quoting *In re Genmar Holdings, Inc.,* 776 F.3d 961, 964 (8th Cir. 2015)).  Mr. Monroe testified that the standard practice between the parties was that upon delivery of the last load of grain under a contract and presentment of the delivery ticket to the Debtor, M-Real Estate would be paid immediately.  Although this is some evidence of the intention on the part of M-Real Estate to be paid immediately upon presentment of its delivery ticket, there is no evidence of the Debtor's intention for the exchange to be contemporaneous.  Further, as discussed below in regard to the second element, the documentary evidence is contrary to such an intention on the part of the Debtor.  For these reasons, the Court finds that the evidence does not support a finding that *both* parties intended the exchange to be contemporaneous.

The second element requires evidence to support a finding that the exchange was, in fact, contemporaneous.  Although Mr. Monroe testified that once Mr. Freeland would receive the delivery ticket from the driver he would immediately take the delivery ticket to the Debtor for payment and be paid within twenty-four hours, the Court has already found this testimony lacks credibility due to a lack of basis or personal knowledge on the part of Mr. Monroe.  In addition, Mr. Monroe admitted he did not know the actual time frame for the delivery of the ticket and payment by the Debtor with respect to Check 4474.

The more credible evidence for this second element supports a finding that the Debtor and M-Real Estate would enter into a contract for the sale of grain and the grain would be

delivered over time until the contract was completed. This is evidence of an exchange intended to take place over the period necessary for delivery of the proper number of truckloads of grain to fulfill the contract terms, not a contemporaneous exchange. The delivery sheet for TG # 1058 reflects the delivery dates for the nine loads with the last load being delivered on June 30, 2014. The delivery sheet for IR # 583 reflects the delivery dates for the seven loads with the last load being delivered June 16, 2014. Check 4474 was issued July 18, 2014. This evidence does not support a finding that the exchange was, in fact, contemporaneous.

The third element is that the exchange was for new value. New value is defined by statute to mean "money or money's worth in goods, services, or new credit, or release by a transferee of property previously transferred to such transferee in a transaction that is neither void nor voidable by the debtor or the trustee under any applicable law, including proceeds of such property, but does not include any obligation substituted for an existing obligation." 11 U.S.C. § 547(a)(2) (2012). When new value is given in a contemporaneous exchange "other creditors are not adversely affected" by the transfer. *Jones Truck Lines, Inc. v. Cent. States, Se. & Sw. Areas Pension Fund (In re Jones Truck Lines, Inc.),* 130 F.3d 323, 326 (8th Cir. 1997) (citing *Pine Top Ins. Co. v. Bank of Amer. Nat'l Trust & Sav. Ass'n*, 969 F.2d 321, 324 (7th Cir. 1992)).

There was no evidence introduced to support a finding that new value was given to the Debtor in exchange for Check 4474. In fact, to the contrary, the evidence reflects that Check 4474 was in payment of grain delivered pursuant to two contracts entered into sometime in the past and delivered in a total of sixteen different loads. No other value is alleged to have been given at the time of the transfer.

27

Therefore, the Court finds that M-Real Estate has failed to meet its burden of proof on the affirmative defense of contemporaneous exchange for new value, and judgment will be entered in favor of the Trustee on this affirmative defense.

## CONCLUSION

For the reasons stated in the foregoing memorandum opinion, the transfer represented by Check 4474 is found to be a preferential transfer pursuant to 11 U.S.C. § 547(b), and the Court finds in favor of the Trustee on that issue.   The Court also finds in favor of the Trustee on the affirmative defenses raised by M-Real Estate that included the defenses of ordinary course of business between the Debtor and M-Real Estate under 11 U.S.C. § 547(c)(2)(A), ordinary business terms under 11 U.S.C. § 547(c)(2)(B), and contemporaneous exchange for new value under 11 U.S.C. § 547(c)(1).

The Trustee's action pursuant to 11 U.S.C. § 548(a)(1)(B) is dismissed as abandoned by the Trustee.  The transfer represented by Check 4474 in the amount of $18,545.84 is determined to be an avoidable transfer recoverable by the Trustee from M-Real Estate in accordance with 11 U.S.C. § 550.  A separate judgment in favor of the Trustee will be entered concurrently with the entry of this memorandum opinion.

**IT IS SO ORDERED.**

Phyllis M. Jones
United States Bankruptcy Judge
Dated:  04/23/2018